**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

RIVER NILE INVALID COACH AND
AMBULANCE, INC.,

        Plaintiff,

    v.

JENNIFER VELEZ, ESQ., as COMMISSIONER,
NEW JERSEY DEPARTMENT OF HUMAN
SERVICES, and JOHN GUHL, as DIRECTOR, NEW
JERSEY DIVISION OF MEDICAL ASSISTANCE
AND HEALTH SERVICES, and DAVID
ROUSSEAU, as TREASURER, NEW JERSEY
DEPARTMENT OF THE TREASURY, and JOHN V.
NIAMAN, JR., as DIRECTOR, DIVISION OF
PURCHASE AND PROPERTY,

        Defendants.

Civ. No. 08-5847 (DRD)

**O P I N I O N**

*Appearances by:*

ARCHER & GREINER
John C. Connell, Esq.
Robert J. Fogg, Esq.
P.O. Box 3000
One Centennial Square
Haddonfield, New Jersey 08033

    *Attorneys for Plaintiff*

ANNE MILGRAM
Attorney General of New Jersey
Dianna Rosenheim, Esq.

1

Richard J. Hughes Justice Complex
P.O. Box 112
25 Market Street
Trenton, New Jersey  08625

*Attorneys for Defendants New Jersey Department of Human Services and New Jersey Department of Treasury*

**DEBEVOISE, Senior District Judge**

On December 1, 2008, plaintiff River Nile Invalid Coach and Ambulance, Inc. ("River Nile") filed a verified complaint in support of an order to show cause and for preliminary injunctive relief against Jennifer Velez, Esq., as Commissioner of the New Jersey Department of Human Services ("DHS"); John Guhl, as director of the New Jersey Division of Medical Assistance and Health Services ("DMAHS"); David Rousseau, as Treasurer of the New Jersey Department of the Treasury ("Treasury"); and John Naiman, Jr., as director of the Division of Purchase and Property ("DPP") (collectively, the "Defendants").  River Nile seeks an injunction to prevent Defendants from awarding a contract to an independent broker for non-emergency medical transportation ("NEMT") services pursuant to a request for proposal issued in April 2008 by Treasury.  The court issued the order to show cause and held a hearing on December 15, 2008.  At the hearing, the Defendants agreed to provide River Nile with written notice ten days prior to awarding a contract pursuant to the request for proposal.  On December 1, 2008, an unsuccessful bidder filed a protest that is pending before the DPP, so the award of the contract has been delayed.  River Nile now moves for summary judgment and the Defendants cross move for summary judgment.  For the reasons set forth below, River Nile's motion will be denied and the Defendants' motion will be granted.

## I.  BACKGROUND

2

A.     **The Parties**

DHS includes and oversees the operation of DMAHS, which is a division within DHS. The New Jersey State Department of Health and Senior Services ("HSS") is the state agency responsible for overseeing and regulating the licensing and operation of, among others, providers of medical transportation services in New Jersey.  DHS is the state agency responsible for DMAHS, the designated state Medicaid agency for New Jersey.  DMAHS is the state agency responsible for implementing and managing the Medicaid program, in which licensed providers of medical transportation services participate to provide medical transportation services that are statutorily mandated in New Jersey to Medicaid beneficiaries.

River Nile is an ambulance coach service with its principal place of business in East Orange, New Jersey.  River Nile is authorized to provide at least two types of transportation services:

> (1)  ground ambulance transportation services, which are non-emergency medical transportation services, in a vehicle that is licensed, equipped, and staffed in accordance with New Jersey State Department of Health and Senior Services rules, as specified in N.J.A.C. 8:40; and

> (2)  mobility assistance vehicle ("MAV") services, which are non-emergency health care transportation services, in a vehicle that is licensed, equipped, and staffed in accordance with New Jersey State Department of Health and Senior Services Rules to provide non-emergency health care transportation as specified in N.J.A.C. 8:40 & 41 by certified trained personnel, for sick, infirm or otherwise disabled individuals, who are non-ambulatory or require such assistance and are under the care and supervision of a physician, and whose medical condition is not of sufficient magnitude or gravity to require transportation by ambulance, but whose medical condition requires transportation door-to-door for medical care.

River Nile has a "provider agreement" with DMAHS, which was signed on June 3, 2004 by

Ibrahim Ahmed, President of River Nile.  The agreement contains the following termination

provision:  "The provider or DMAHS may, on 60 days written notice to the Division, terminate

this Agreement without cause."

**B.      Medicaid**

Medicaid is a federally-created, state-implemented program designed, in broad terms, to

afford access to necessary medical care to those who otherwise cannot afford it.  See 42 U.S.C.

§ 1396, et seq.  (the "Medicaid Statute").  The program "was created to provide medical

assistance to the poor at the expense of the public."  Mistrick v. Div. of Med. Assistance &

Health Servs., 154 N.J. 158, 165 (1998) (citing Atkins v. Rivera, 477 U.S. 154, 156 (1986)).  It is

an "optional cooperative program in which '[t]he Federal Government shares the costs . . . with

States that elect to participate in the program.'"  Id. at 165-66, 188 (quoting Atkins, 477 U.S. at

156-57).  States that participate "are required to comply with Title XIX of the Social Security

Act, and the regulations adopted by the Secretary of Health and Human Services."  Id. at 166

(citing Atkins, 477 U.S. at 157).  New Jersey has elected to participate in the program by

enacting the Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 to -19.5.

The Commissioner of DHS is granted the authority to do or cause to be done all things

necessary to secure the maximum benefits under the Medicaid program for the State of New

Jersey, "to the extent authorized by the medical assistance program plan."  N.J.S.A. 30:4D-7.

This authority is granted with the general requirement that it be carried out "consistent with

fiscal responsibility and within the limits of funds available for any fiscal year," and includes the

ability to enter into contracts to carry out the provisions of the Medicaid act.  Id.  Further, the

State must develop and employ methods and procedures regarding the utilization of, and the

4

payment for, care and services available under Medicaid as necessary to safeguard against unnecessary utilization of such care and services and "to assure that payments are consistent with efficiency, economy, and quality of care."  42 U.S.C. § 1396a(a)(30); N.J.S.A. 30:4D-12.

**C.      NEMT Brokerage Programs**

Under the provisions of the federal Deficit Reduction Act of 2005, States are authorized to establish an NEMT brokerage program for beneficiaries who need access to medical care but have no other means of transportation.  States that adopt a brokerage program may contract with a broker who, among other things,

> (i) is selected through a competitive bidding process based on the State's evaluation of the broker's experience, performance, references, resources, qualifications, and costs;
> (ii) has oversight procedures to monitor beneficiary access and complaints and ensure that transport personnel are licensed, qualified, competent, and courteous; [and]
> (iii) is subject to regular auditing and oversight by the State in order to ensure the quality of the transportation services provided and the adequacy of beneficiary access to medical care and services.

42 U.S.C. § 1396a(a)(70)(B)(i)-(iii).  The Centers for Medicaid and Medicare Services ("CMS"), within the U.S. Department of Health and Human Services, recently promulgated rules regarding the NEMT brokerage programs, which provide:

> At the option of the State, . . . a State plan may provide for the establishment of a non-emergency medical transportation brokerage program in order to more cost-effectively provide non-emergency medical transportation services for individuals eligible for medical assistance under the State plan who need access to medical care or services, and have no other means of transportation . . . .
>
> (i) Non-emergency medical transportation services may be provided under contract with individuals or entities that meet the following requirements:
>     (A) Is selected through a competitive bidding process that is consistent with 45 CFR 92.36(b) through (i) and is based on the

State's evaluation of the broker's experience, performance, references, resources, qualifications, and costs.

(B) Has oversight procedures to monitor beneficiary access and complaints and ensure that transportation is timely and that transport personnel are licensed, qualified, competent, and courteous.

(C) Is subject to regular auditing and oversight by the State in order to ensure the quality and timeliness of the transportation services provided and the adequacy of beneficiary access to medical care and services.

(D) Is subject to a written contract that imposes the requirements related to prohibitions on referrals and conflicts of interest described at § 440.170(a)(4)(ii), and provides for the broker to be liable for the full cost of services resulting from a prohibited referral or subcontract.

42 C.F.R. § 440.170(a)(4)(i)(A)-(D).

DMAHS decided to implement an NEMT program in New Jersey.  On September 28, 2006, DMAHS submitted a state plan amendment to CMS for permission to implement an NEMT broker system.  (Verified Compl. Ex. 1.)  CMS approved the state plan amendment on May 4, 2007.  In June 2007, public notices concerning the state plan amendment were published in 18 major newspapers in New Jersey, and DMAHS met with transportation providers to advise them of the new broker system that DMAHS intended to implement.

As defined in the State Plan, the broker is to "arrange for 1) Mobility Assistance Vehicle ('MAV') transportation and all nonemergency Basic Life Support Ground Ambulance Services in all counties . . . and 2) livery services in the counties specified in the State contract . . . ."  (Id.)  The broker is to develop and maintain a provider network, verify the eligibility of beneficiaries, determine and authorize the appropriate mode of transport for beneficiaries requesting the service, dispatch the appropriate vehicle for the transport, and administer a quality assurance program.  (Id.)  The broker will not be a provider of transportation.  (Id.)  The broker will be paid a capitated payment per beneficiary per month, and the broker will pay the providers directly.

6

(Id.)  The state will then not reimburse any providers of emergency transportation services.  (Id.)

### D.      State Audit

In 2008, the State Auditor of the New Jersey State Legislature, Office of Legislative Services, released a draft report of its audit, entitled "Department of Human Services Division of Medical Assistance and Health Services Medical Transportation Services," which covered the period between July 1, 2005 and September 30, 2007.  The report concluded that medical transportation claims were properly processed, but "some post-payment review procedures utilized by the division for medical transportation services need[ed] strengthening."  (Verified Compl. Ex. 2 at 2.)  The report made four recommendations based on its review; it found that the DMAHS should (1) ensure that providers include all required information on transportation certifications; (2) ensure that trips were for eligible medical services; (3) ensure that livery providers bill properly for multiple loads; and (4) improve its procedures for follow-up reviews of transportation providers.  (Id. at 4-8.)  By letter dated June 26, 2008, DMAHS responded to the findings and recommendations in the audit report.  In the letter, DMAHS stated that it agreed "to conduct more post-payment reviews" and was "in the process of contracting with a broker to provide future coordination and oversight of medical transportation services."  (Verified Compl. Ex. 3 at 1.)

### E.      The RFP

In June 2007, DMAHS (through the DPP of Treasury) issued a request for proposals for a statewide transportation broker to provide brokered NEMT services consistent with the state plan; that request was withdrawn in November 2007.  On November 15, 2007, River Nile sent a

Notice of Intent to participate in the transportation network of LogistiCare, one of the companies that entered a bid to be selected as the transportation broker for the new NEMT broker system.

In April 2008, Treasury issued Request for Proposal 08-X-20091 for:  Transportation Broker Services – Division of Medical Assistance and Health Services (the "RFP").  The stated purpose of the RFP was "to solicit bid proposals for a primary single-source vendor to arrange for Livery services in Essex and Hudson Counties only and livery transportation in other counties as those other counties agree to participate in the program for all eligible Medicaid Managed Care (MMC) and Fee For Service (FFS) beneficiaries" and for "Mobility Assistance Vehicle (MAV) transportation, Air Transportation Services, Basic Life Support (BLS) and Advanced Life Support (ALS) Ground Ambulance Services."  (Verified Compl. Ex. 4 at 5.)  The RFP further stated that "DHS intends to procure the services of a PRIMARY single-source vendor . . . who will have the responsibility for maintaining a provider network; determining the appropriate mode of transport; and dispatching an appropriate vehicle to transport beneficiaries; and developing a quality assurance program to ensure access to the appropriate mode of transport based on medical necessity."  (Id.)  That vendor "may engage current transportation providers" and "will be responsible for paying the network provider."  (Id.)  The vendor's responsibilities include, but are not limited to, "contract negotiation, credentialing providers, marketing, provider enrollment, claims adjudication, prior authorization, management information systems, financial management, and reporting."  (Id. at 19.)

The vendor's responsibility for "credentialing providers" is particularly at issue in this case.  The RFP states that the vendor "shall implement a credentialing/recredentialing process to ensure that those requiring licensure/certification under the scope and terms of this contract are

8

qualified to perform covered services."  (Id. at 25.)  This process is to include written policies and procedures for credentialing; oversight by the Medical Director;[1] use of a credentialing committee to make recommendations regarding credentialing decisions; and a credentialing process that must include obtaining and/or verifying the following information:  (1) valid DHSS vehicle license for MAV; (2) valid MVC or neighboring State Driver's License; (3) valid vehicle registration; (4) valid certificate of insurance; (5) valid insurance identification cards; (6) criminal history background check; (7) fingerprinting; (8) status as Approved Medicare Provider, if applicable.  (Id. at 26.)  The RFP also includes the following provisions regarding credentialing:

> 3.4.4  The contractor retains the right to approve new providers, and to terminate or suspend individual providers.  The contractor shall have policies and procedures for the suspension, reduction or termination of network privileges.  The contractor shall report immediately to the State Contract Manager[2] any suspension, reduction or termination of network privileges.
>
> 3.4.5  The contractor shall provide a mechanism for, and evidence of the implementation of the reporting of serious quality deficiencies resulting in suspension or termination of a provider, to the appropriate authorities.  MAV and BLS deficiencies should be reported to DHSS and livery deficiencies should be reported to DMAHS.
>
> 3.4.6  While the contractor may terminate a network provider for "no cause," the network provider shall be afforded an appeals process, which shall be described in the Operations Manual and will be subject to State approval.  This process shall not apply in cases involving imminent harm to patient care, a determination of fraud, or

---

[1] The following definition for "Medical Director" is provided in the RFP:  "May be a physician, registered nurse or a nurse practitioner, licensed in the State of New Jersey, designated by the contractor to exercise general supervision over the prior authorization process."  (Id. at 15.)

[2] The RFP defines "State Contract Manager" as:  "The individual responsible for the approval of all deliverables, i.e., tasks, sub-tasks or other work elements in the Scope of Work as set forth in Sections 8.1, 8.1.1 and 8.1.2."  (Id. at 11.)

a final disciplinary action by a State licensing board or other governmental agency.

3.4.7  The contractor shall not terminate or refuse to renew a contract for participation in the contractor's network, solely because the provider has (1) advocated on behalf of a beneficiary; (2) filed a complaint against the contractor; (3) appealed a decision of the contractor; or (4) requested review.

3.4.8   The contractor shall ensure compliance with federal requirements prohibiting employment of or contracts with individuals excluded from participation under the terms and requirements set forth by either Medicare or Medicaid or both.

(Id. at 26.)

Under the RFP, the broker will have the authority to terminate its contract with an NEMT provider without cause (just as DMAHS currently may terminate its contract with River Nile for no cause), but will be required to afford the provider an appeals process.  DMAHS, however, will retain the sole authority to make determinations of good cause for exclusion from the Medicaid program.  Mandatory exclusions of certain service providers are provided for under 42 C.F.R. § 1002.203; for example, a service provider owned by a person who has been convicted of certain types of criminal offenses must be excluded.  See id. § 1001.1001.  Under Federal law, "exclusion" means that a provider will not be reimbursed for services or items furnished under Medicare, Medicaid or other Federal health care programs until the excluded entity is reinstated by the Office of Inspector General.  Id. § 1001.2  Such exclusions last for at least five years.  Id. § 1001.102.  Providers must apply to OIG for reinstatement after the period of exclusion has expired.  Id. §§ 1001.3001 – 1001.3002.  New Jersey law has similar provisions for exclusions, which it defines as "the suspension, debarment or disqualification" of any provider from participation in any program administered by DMAHS.  N.J.A.C. 10:49-11.1(c).  A suspension

can last up to 18 months, N.J.A.C. 10:49-11.1(1); a debarment lasts up to five years, N.J.A.C.

10:49-11.1(g); and a disqualification lasts up to eight years, N.J.A.C. 10:49-12.3(b).  If a

provider is excluded under New Jersey law, it must apply to DMAHS for an end to the exclusion

period before it can re-apply to the Medicaid program.  N.J.A.C. 10:49-12.3.  State exclusions

must be reported to the U.S. Department of Health and Human Services, and States must give

excluded providers "the opportunity to submit documents and written argument against the

exclusion."  42 C.F.R. § 1002.213.  Under the RFP, the broker must consult with the OIG

website to ensure that it does not contract with an excluded provider, but it does not have the

power to put a provider on the exclusion list.

## II.  DISCUSSION

### A.    Standard of Review for Summary Judgment

Summary judgment is proper where "there is no genuine issue as to any material fact

and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  For

an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury

could find for the non-moving party."  Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir.

2006).  For a fact to be material, it must have the ability to "affect the outcome of the suit under

governing law."  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of

summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no

genuine issue of material fact exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  When

the moving party does not bear the burden of proof at trial, the moving party may discharge its

burden by showing that there is an absence of evidence to support the non-moving party's case.

Id. at 325.  If the moving party can make such a showing, then the burden shifts to the

non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary.

Id. at 324.  In meeting its burden, the non-moving party must offer specific facts that establish a

genuine issue of material fact, not just create "some metaphysical doubt as to the material facts."

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In deciding whether an issue of material fact exists, the court must consider all facts and

their reasonable inferences in the light most favorable to the non-moving party.  See Pa. Coal

Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The court's function, however, is not to

weigh the evidence and determine the truth of the matter, but rather to determine whether there is

a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  If there are

no issues that require a trial, then judgment as a matter of law is appropriate.

**B.**     **Procedural Due Process**

River Nile argues that "[a] Medicaid transportation service provider has a vested property

right related to its continuing participation and the State cannot deprive a provider of that right

without due process."  (Plt.'s Summ. J. Mot. at 6.)  River Nile bases its claim for due process on

the Fourteenth Amendment to the United States Constitution, which provides that no State shall

"deprive any person of life, liberty, or property, without due process of the law."[3]  As the United

States Supreme Court recently explained, "[t]he procedural component of the Due Process

---

[3] River Nile also bases its argument on a similar provision in the Constitution of the State of New Jersey.  Article I, Paragraph 1 of the New Jersey Constitution states, "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."  The phrase "due process" does not appear in the New Jersey Constitution, but the New Jersey Supreme Court has construed the expansive language of Article I, Paragraph 1 as guaranteeing that fundamental constitutional right.

Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.'"  Town of Castle Rock, Colo. v. Gonzalez, 545 U.S. 748, 756 (2005) (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)).  Such entitlements are "not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  Id. (quoting Paul v. Davis, 424 U.S. 693, 709 (1976) (internal quotations omitted)).  Thus, to establish that it has a claim to due process, River Nile must first prove that it has a protected property right based in an independent source.

River Nile alleges several such "independent sources" from which it claims its entitlement stems.  First, River Nile argues that it has a protected property right established in the New Jersey Administrative Code:  "A provider may be granted a hearing because of the denial of a prior authorization request or issues involving the provider's status; for example, termination, debarment, suspension, and so forth, as described in N.J.A.C. 10:49-11.1, or issues arising out of the claims payment process."  N.J.A.C. 10:49-9.14(b).  River Nile argues that this provision means that "providers, such as plaintiff, must be given notice and a full and fair hearing before their property rights are suspended or terminated" and that "unilaterally terminating or suspending contracts without the above procedure [as described in N.J.A.C. 10:49-9.14(b)], the RFP violates plaintiff's procedural due process rights."  (Plt.'s Prelim. Inj. Br. at 12 (emphasis added).)  The provision upon which River Nile relies, however, states that a

---

Caviglia v. Royal Tours of Am., 178 N.J. 460, 472 (2004).

provider <u>may</u> be granted a hearing; River Nile's claim that this provision means that providers

<u>must</u> be given a hearing runs contrary to a basic tenet of statutory interpretation – namely, that

"shall" or "must" describe mandatory actions, while "may" describes optional actions.  <u>Jama v.</u>

<u>Immigration & Customs Enforcement</u>, 543 U.S. 335, 346 (2005).  "That connotation is

particularly apt where, as here, 'may' is used in contraposition to the word 'shall.'"  <u>Id.</u>

Immediately following the provision upon which River Nile relies, the word "shall" is used

regarding review of beneficiaries' grievances:  "NJ FamilyCare-Plan B, C and all other Plan D

beneficiaries <u>shall</u> be afforded the opportunity for grievance review in accordance with N.J.A.C.

10:78-8."  N.J.A.C. 10:49-9.14(c) (emphasis added).  Additionally, DMAHS is required by

statute to ensure "that providers <u>shall</u> be afforded the opportunity for an administrative hearing

within a reasonable time on any valid complaint arising out of the claim payment process."

N.J.S.A. 30:4D-7(f) (emphasis added).  Thus, providers must be given a hearing relating to

complaints arising out of the claim payment process, but there is no similar guarantee regarding

issues involving the provider's status; for those issues, providers <u>may</u> (or may not) be granted a

hearing.  N.J.A.C. 10:49-9.14(b).  Section 10:49-9.14(b) of the New Jersey Administrative Code

does not confer upon River Nile a protected property interest.

      River Nile also alleges that the basis for a protected property right in its continued

participation as a Medicaid provider can be found in 42 C.F.R. § 431.152, which requires that a

state plan "provide for appeal procedures that, as a minimum, satisfy the requirements of

§§ 431.153 and 431.154."  Sections 431.153 and 431.154 do indeed include requirements for

notice and evidentiary hearings, but these sections apply only to nursing facilities and

intermediate care facilities for the mentally retarded, not to all providers in general or to

transport providers specifically.  42 C.F.R. § 431.151(a)(1)-(3) (defining the scope and

applicability of the subpart).  River Nile further argues that "rules at 42 CFR § 431.214 also

provide authority for a provider hearing for exclusions, which are defined to include

terminations."  (Plt.'s Prelim. Inj. Reply Br. at 5.)  That section, however, is not relevant;  it

deals with "notice in cases of possible fraud," and the broader subpart in which the section is

found is directed to fair hearings for <u>applicants</u> and <u>recipients</u>; it provides no support for the

argument that a <u>provider</u> is owed a hearing for exclusions.  42 C.F.R. § 431.200 <u>et seq.</u>  These

sections do not confer upon River Nile a protected property interest.

 River Nile also bases its argument that a Medicaid transportation service provider has a

protected property right in its continued participation in the Medicaid program on two cases:

<u>Town Court Nursing Center, Inc. v. Beal</u>, 586 F.2d 266 (3d Cir. 1978) and <u>Pressley Ridge Sch.,</u>

<u>Inc. v. Stottlemyer</u>, 947 F. Supp. 929 (S.D.W.V. 1997).  In <u>Town Court</u>, the plaintiff, a nursing

home, challenged the procedures by which its eligibility to be reimbursed under Medicaid and

Medicare was terminated or not renewed.  <u>Town Court</u>, 586 F.2d at 268.  The plaintiff's provider

agreement was not renewed after at least two survey teams found severe deficiencies in both

administrative and medical areas, and found the plaintiff to be out of compliance with several

conditions of participation as a Medicaid provider over the course of approximately a year.  <u>Id.</u> at

271-72.  Specifically, the plaintiff argued that it was a violation of its procedural due process

rights for its eligibility to end without benefit of a full evidentiary hearing at the administrative

level and for the district court to deny full judicial review prior to such termination of its rights.

<u>Id.</u>  at 268.  The Court of Appeals held that the plaintiff was not entitled to an evidentiary

hearing and judicial review prior to the termination of its provider agreement, and that "[t]he

procedures established were sufficient to protect whatever interest [the plaintiff] had in continued participation in the Medicare and Medicaid programs." Id. at 277.  The Court of Appeals emphasized that "nursing homes are not the intended beneficiaries of the Medicare program at all," id., and quoted at length from a decision of the Court of Appeals for the Second Circuit:

> A nursing facility's "need" for patients has nothing to do with the statutory benefits structure.  The facility's need is incidental.  That a particular nursing facility cannot survive without Medicaid participation was certainly not Congress' foremost consideration in its creation of the Medicaid program.  This is not to derogate Mrs. Case's property interest in her expectation of continued participation.  We must, however, place that right in proper perspective with regard to the health and safety expectations of the patients, which expectations the Secretary has a valid interest in protecting.  The benefits to a nursing home from its participation in Medicaid reimbursement result from nothing more than a statutory business relationship.

Id. (quoting Case v. Weinberger, 523 F.2d 602, 607 (2d Cir. 1975) (quotations omitted)).

River Nile argues that Town Court supports its position that it has a protected property right in its continued participation in the Medicaid program based on two phrases in the opinion – first, that the procedures "were sufficient to protect whatever interest [the plaintiff] had in continued participation in the Medicare and Medicaid programs," and, second, the statement of the Second Circuit, quoted by the Court of Appeals, that it did not intend "to derogate Mrs. Case's property interest in her expectation of continued participation" in the Medicaid program. Id.  However, the use of the term "whatever interest" a plaintiff may have does not equate to a holding that something is a protected property right.  Indeed, the ultimate holding in Town Court was that the plaintiff was not entitled to an evidentiary hearing and judicial review prior to the termination of its provider agreement.  This holding simply does not support the argument that

16

participation as a Medicare provider is a protected property interest.  Further, the <u>Town Court</u> case dealt with a nursing facility, not an NEMT provider.  As discussed above, there are federal regulations that require notice and evidentiary hearings that apply specifically to nursing facilities (and intermediate care facilities for the mentally retarded), but no equivalent regulations exist for NEMT providers or all Medicaid providers in general.  Thus, even if the Court of Appeals had held in <u>Town Court</u> that the nursing facility had a protected property interest in continued participation in the Medicaid program, it would not necessarily follow that an NEMT provider would have the same protected interest.

In <u>Pressley</u>, the other case relied upon by River Nile, the Southern District of West Virginia held that "Plaintiff's interest in receiving reimbursement for services to Medicaid recipients is a protectable property interest under the Fourteenth Amendment."  <u>Pressley</u>, 947 F. Supp. at 940.  <u>Pressley</u> related to claims for reimbursement for services <u>already</u> <u>rendered</u> to Medicaid recipients, which is not an issue in this case.  The defendants in <u>Pressley</u> retroactively applied new standards to claims for reimbursement for services rendered when other standards were in place.  River Nile does not argue that it has been denied reimbursement for services already rendered or that it has a protected property interest in such reimbursement.  Rather, it argues that it has a protected property interest in continued participation, in the future, as a Medicaid provider.  <u>Pressley</u> does not support such a claim.

Because River Nile does not have a protected property interest in continuing as an NEMT provider in the Medicaid program, its procedural due process rights have not been (or will not be) violated by the implementation of the transportation broker program.

**C.      Substantive Due Process**

17

River Nile also claims that its substantive due process rights will be violated by the implementation of the transportation broker program.  The Supreme Court has held that the Due Process Clause of the United States Constitution also "protects certain 'fundamental liberty interest[s]' from deprivation by the government, regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest."  Chavez v. Martinez, 538 U.S. 760, 775 (2003) (citing Washington v. Glucksberg, 521 U.S. 702, 721 (1997)).  A violation of substantive due process involves the "exercise of power without any reasonable justification in the service of a legitimate governmental objective."  County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998) (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)).  This doctrine of substantive due process covers "[o]nly fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty.'"  Chavez, 538 U.S. at 775 (quoting Glucksberg, 521 U.S. at 721).  A "'careful description' of the asserted fundamental liberty interest for the purposes of substantive due process analysis" is required; "vague generalities" will not suffice.  Id. (quoting Glucksberg, 521 U.S. at 721).  As explained by the Supreme Court of New Jersey in Rivkin v. Dover Township Rent Leveling Board, 143 N.J. 352, 366 (1996), "[S]ubstantive due process is reserved for the most egregious governmental abuses against liberty or property rights, abuses that 'shock the conscience or otherwise offend . . . judicial notions of fairness . . . [and that are] offensive to human dignity.'"  Id.  (quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989)).  Here, River Nile does not provide a "careful description" of an asserted "fundamental liberty" other than to argue that "the RFP impermissibly gives the contractor the right to arbitrarily terminate or suspend existing contracts," and that such "delegation of authority is too broad to pass muster

18

under the standards for substantive due process." (Plt.'s Prelim. Inj. Mot. at 13.) Given that

River Nile's current contract with DMAHS may be terminated without cause upon 60 days

notice, the ability of the broker to terminate such a contract without cause does not "shock the

conscience" and cannot be considered among "the most egregious governmental abuses against

liberty or property rights," particularly because the broker is required to afford a terminated

provider with an appeal. Further, the implementation of a transportation broker system serves a

legitimate governmental objective – to provide services to Medicaid beneficiaries at a lower cost.

  River Nile also argues that the situation in this case is similar to the situation addressed in

Group Health Insurance v. Howell, 40 N.J. 436 (1963). There, the Supreme Court of New Jersey

held that a law, which effectively provided that no one could be elected as a trustee of a medical

service corporation unless the Medical Society of New Jersey approved the nomination, violated

the New Jersey Constitution because it gave legislative licensing power to a private organization

that had an interest in promoting the welfare of a particular medical service corporation. The

Court held that

> [A] power to determine who shall have the right to engage in an
> otherwise lawful enterprise may not validly be delegated by the
> Legislature to a private body which, unlike a public official, is not
> subject to public accountability, at least where the exercise of such
> power is not accompanied by adequate legislative standards or
> safeguards whereby an applicant may be protected against arbitrary
> or self-motivated action on the part of such private body.

Id. at 445. The RFP, however, does not delegate to the broker the power to determine "who shall

have the right to engage in an otherwise lawful enterprise." If the transportation broker system is

implemented, NEMT providers will still obtain their licenses from the State and, once licensed,

will be free to provide NEMT services to private clients or to contract with the transportation

broker to provide NEMT services to Medicaid beneficiaries.  As discussed above, the broker will

be able to contract with and terminate providers, but it will not have the power to "exclude" a

provider, as defined in the Medicare regulations.  The broker will choose with which NEMT

service providers it will contract, but, again, NEMT providers to not have a protected property

right to participate as Medicare service providers.[4]

## D.      Taking Without Just Compensation

River Nile argues that "because the Plaintiffs [sic] have protected property interests in

continuing participation as a Medicaid transportation service provider, they are entitled to

compensation pursuant to the requirements of the Fourteenth Amendment of the Constitution."

 (Plt.'s Summ. J. Mot. at 21.)  The Court of Appeals has "consistently taken a narrow view of

what constitutes a taking of property by regulation."  Midnight Sessions, Ltd. v. City of

Philadelphia, 945 F.2d 667, 677 (3d Cir. 1991).  "Before the takings inquiry is even applicable,

however, there must be a property interest at stake."  Rogers v. Bucks County Domestic

Relations Section, 959 F.2d 1268, 1275 (3d Cir. 1992).  As explained above, River Nile does not

have a protected property interest in continued participation in the Medicaid program and at the

moment has a contract with DMAHS to provide NEMT services, which either party can

terminate, without cause, on 60 days notice.  Thus, there has not been, nor will there be if the

broker system is implemented, a taking without just compensation.[5]

---

[4] River Nile also argues that its contract to provide NEMT services is "an unconscionable
contract of adhesion" and that "the court should disregard the unconscionable clause that the
State is seeking to interpret as a waiver of a Medicaid service provider's statutorily protected
rights."  (Plt.'s Summ. J. Mot. at 15-16.)  Again, as discussed above, River Nile does not have a
protected property right in its continued participation as a Medicaid provider to waive.
[5] River Nile also argues that it did not waive its rights based upon the provision in its contract
with the State that the contract may be terminated for no cause with 60 days notice.  River Nile

E.    **Standing**

The Supreme Court has explained that "the irreducible constitutional minimum of

standing contains three elements."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

First, the plaintiff must prove that it has suffered "an 'injury in fact' - an invasion of a legally

protected interest which is (a) concrete and particularized, and (b) actual or imminent, not

conjectural or hypothetical."  Id. (internal citations and quotations omitted).  Second, the plaintiff

must prove a "causal connection between the injury and the conduct complained of - the injury

has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result

[of] the independent action of some third party not before the court."  Third, the plaintiff must

prove that it is "likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision."  Id. at 561 (internal quotations omitted).

River Nile argues that it has standing to challenge the Defendants' implementation of the

transportation broker program because it has a "legally protected property interest" in its

continued participation as an NEMT service provider in the New Jersey Medicaid program.

(Plt.'s Summ. J. Mot. at 18.)  River Nile argues that "[b]y granting a broker the ability to

terminate and suspend this property interest, the State is putting the Plaintiffs [sic] 'immediately

in danger of sustaining some direct injury.'"  (Id. citing O'Shea v. Littleton, 414 U.S. 488, 494

(1974)).  As explained above, River Nile does not have such a protected property interest.  There

is no such protection provided to River Nile through statute or regulation, and River Nile's

---

argues that this "contract of adhesion" does "not clearly express that the provider would be
waiving a protected property right by entering into the contract."  (Plt.'s Summ. J. Mot. at 15.)
River Nile is correct that the agreement does not express that the provider would be waiving a
protected property right.  As explained above, there is no such protected property right to be
waived.

current contract with DMAHS to provide NEMT services may be terminated without cause upon 60 days notice.  Additionally, the implementation of the transportation broker system has no effect on River Nile's ability to provide NEMT services to other (non-Medicaid) clients and there is no evidence that River Nile, which has signed a letter of intent to participate in the network of potential transportation broker LogistiCare, will not continue to provide NEMT services to Medicaid beneficiaries under the transportation broker system.  Therefore, River Nile does not have standing to challenge the Defendants' implementation of the transportation broker system.

## IV.  CONCLUSION

For the reasons set forth above, River Nile's motion for summary judgment will be denied and the Defendants' motion for summary judgment will be granted.  The Court will enter an order implementing this opinion.


            /s Dickinson R. Debevoise
          DICKINSON R. DEBEVOISE, U.S.S.D.J.



Dated:  March 9, 2009